IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHICAGO HOUSING AUTHORITY, a municipal corporation, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| SCOTT TURNER, in his official capacity as Secretary of the U.S. Department of Housing and Urban Development; the U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) ) |
| Defendants. | ) ) |

No. 25cv12670

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................. 1

II. JURISDICTION AND VENUE ........................................................................................... 2

III. PARTIES ............................................................................................................................... 2

IV. FACTUAL ALLEGATIONS ................................................................................................ 2

V. CAUSES OF ACTION ........................................................................................................ 12

    Fifth Amendment Due Process (Vagueness) ..................................................................... 12

    Violation of the APA (Not in Accordance with Law) ....................................................... 12

    Violation of the APA (Arbitrary, Capricious, and an Abuse of Discretion) ..................... 13

    Tenth Amendment .............................................................................................................. 13

    Ultra Vires .......................................................................................................................... 14

    Separation of Powers ......................................................................................................... 14

VI. PRAYER FOR RELIEF ..................................................................................................... 15

## I. INTRODUCTION

1. The federal government's power to attach conditions to federal grants is constrained by the Constitution. But disregarding those limits, the United States Department of Housing and Urban Development (HUD) is trying to compel the Chicago Housing Authority (CHA or "the Authority") to accept new and unconstitutional terms as the price for retaining federal funding necessary to provide housing for about 132,000 low-income residents.

2. Borrowing wholesale from presidential Executive Orders, HUD demands that in exchange for funding, the CHA must certify that it will:

    (a) Prohibit all kinds of activity related to undefined diversity, equity, and inclusion (or "DEI") goals, upon threat of treble damages and False Claims Act penalties ("the DEI Certifications");

    (b) Facilitate immigration enforcement ("the Immigration Conditions");

    (c) Avoid "promoting" so-called "gender ideology" ("the Gender Ideology Certification"); and

    (d) Avoid "promoting" "elective" abortion ("the Reproductive Rights Certification").

3. These new certifications apply to CHA as an employer as well as a housing agency. They bear little or no relation to CHA's purposes—or the grant programs established by Congress for public housing. They are a transparent effort to coerce compliance with various Executive Orders on these subjects despite their vagueness. They violate numerous constitutional and statutory provisions, including (among others): the Fifth Amendment's void-for-vagueness doctrine, the Tenth Amendment's anti-commandeering principle, the Administrative Procedure Act (APA), and separation of powers principles. This lawsuit seeks to enjoin HUD from conditioning the CHA's receipt of federal funding on its consent to these new and unlawful conditions.

## II. JURISDICTION AND VENUE

4. The Court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1346(a)(2).

5. The Court may grant declaratory, injunctive, and other relief under 28 U.S.C. §§ 2201–2202, 5 U.S.C. §§ 705 and 706, and the Court's inherent authority to enjoin federal officials from acting unlawfully.

6. Venue is proper in this district under 28 U.S.C § 1391(e)(1) because this is an action against an officer and an agency of the United States, Plaintiff resides in this District, and a substantial part of the events giving rise to this action occurred here.

## III. PARTIES

7. Plaintiff the Chicago Housing Authority (CHA) is a municipal corporation organized under the Illinois Housing Authorities Act, 310 ILCS 10/1 *et seq.* The CHA is a public housing authority (PHA). It provides housing assistance through both traditional public housing and various voucher programs, including Housing Choice Vouchers (formerly known as Section 8).

8. Defendant Scott Turner is the Secretary of HUD and responsible for HUD's decisions. He is sued in his official capacity.

9. Defendant HUD is an executive department of the federal government, 42 U.S.C. § 3532(a), and an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

## IV. FACTUAL ALLEGATIONS

10. Congress established HUD in 1965 to, among other things, administer programs that "provide assistance for housing" and "development" of the "Nation's communities and metropolitan areas." Department of Housing and Urban Development Act, Pub. L. 89-174, § 2, 79 Stat. 667 (1965) (codified at 42 U.S.C. § 3531).

11. The CHA is the third-largest public housing authority in the country and the largest single owner of rental housing in Chicago. The CHA provides housing for more than 65,000

households, comprising more than 132,000 residents, plus programs and supportive services ranging from job training and health and wellness initiatives to paid summer career experiences for teens.

12. Over 95% percent of CHA's budgeted operating expenses are funded by HUD. The CHA receives about $1 billion in funding from HUD each year.

13. Exhibit A to this Complaint is an image of an electronic Application for Federal Assistance (HUD form SF-424) that HUD requires the CHA to fill out and submit electronically for continued federal funding for FY 2026. The Application, which cannot be modified, requires a series of new certifications—never required before. Congress never authorized these certifications. HUD never submitted them to notice-and-comment rulemaking. The certifications seek to compel sweeping changes with vast economic and political consequences without congressional authorization and in violation of Due Process, the Administrative Procedure Act (APA), and separation of powers principles.

14. Signing and submitting Exhibit A would require the CHA to provide the following certifications, under penalty of perjury, subject to criminal and civil penalty, among others:

   a. The Authority "[s]hall not use grant funds to promote 'gender ideology,' as defined in Executive Order (E.O.) 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*." Exhibit A ¶ 21(i)(1). This is the "Gender Ideology Certification."

   b. The Authority "[s]hall not use any grant funds to fund or promote elective abortions, as required by E.O. 14182, *Enforcing the Hyde Amendment*." *Id*. ¶ 21(i)(4). This is the "Reproductive Rights Certification."

   c. The Authority may not use federal grant funding "in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation." *Id*. ¶ 21(k). This is one of the "Immigration Certifications."

   d. The Authority shall stipulate that violating in any respect any "Federal anti-discrimination law"—or the Administration's interpretation of those civil rights laws

3

      as reflected in its E.O.s—is "material" to the Government's payment decisions for purpose of the federal False Claims Act and the treble damages available under that Act. *Id.* ¶ 21(i)(2). This is one of the "DEI Certifications."

15. In other documents, HUD has publicized new conditions that "may" apply to recipients of HUD's financial assistance. Thus, Exhibit B to this Complaint contains revisions HUD issued as agency-wide "*Requirements and Terms for HUD's Financial Assistance Programs*" (available at https://perma.cc/K5KJ-L8ZF but no longer on HUD's website). With certain exceptions, these revisions identify vague and overbroad conditions on funding that may include that:

   a. "Recipients of Federal Awards must comply with applicable existing *and* future *Executive Orders* …. including but not limited to":

      i. E.O. 14218, 90 Fed. Reg. 10581 (Feb. 19, 2025), which "prohibits taxpayers' resources and benefits from going to unqualified aliens." Exhibit B at No. 24 (one of the Immigration Certifications).

      ii. E.O. 14182, 90 Fed. Reg. 8751 (Jan. 24, 2025), which "prohibits the use of Federal taxpayer dollars to fund *or promote elective* abortion." *Id.* (Reproductive Rights Certification).

      iii. E.O. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025), which "sets forth U.S. policy recognizing two sexes, males and female." *Id.* (Gender Ideology Certification).

      iv. E.O. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025), which calls for "the termination" of "all discriminatory programs and activities," particularly "DEI" programs. *Id.* (one of the DEI Certifications).

      iv. A requirement that recipients "must administer" awards "in accordance with all applicable immigration restrictions and requirements" and may not use HUD funding "in a manner that by design *or effect* facilitates the subsidization *or promotion* of illegal immigration *or abets* policies that seek to shield illegal aliens from deportation." *Id.* at No. 4 (one of the Immigration Certifications).

(Emphases added).

16. Similarly, Exhibit C is a notice HUD issued to all Public Housing Agencies reinforcing that signing an Application for federal assistance (Form SF-424) will constitute certification that a PHA "shall not":

   a. "[U]se grant funds to promote 'gender ideology,' as defined in Executive Order 14168" (Gender Ideology Certification).

   b. "[U[se any grant funds to fund or promote elective abortions, as required by E.O. 14182" (Reproductive Rights Certification).

   c. "[U]se . . . funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation" (one of the Immigration Certifications).

Exhibit C at 8-9. Exhibit C also states that signing and submitting an application for HUD funding will:

   d. Certify that a public housing agency will "administer its grant in accordance with all applicable immigration restrictions and requirements … [and] prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States" (one of the Immigration Certifications), and

   e. Stipulate that "compliance, in all respects, with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of" the federal False Claims Act (one of the DEI Certifications).

*Id.*

17. These new DEI, Immigration, Reproductive Rights, and Gender Ideology Certifications—which HUD seeks to impose on the CHA (and other PHAs)—track and purport to implement a series of Executive Orders. They are inconsistent with both past practice and existing law. By trying to impose them, HUD is unconstitutionally trying to coerce PHAs into complying with vague Presidential Executive Orders, upon threat of losing all federal funding—and to govern by Executive Order, without statutory authority, bypassing both bicameralism or presentment, the two bedrock constitutional requirements for federal lawmaking, and to deny Congress any role.

18. HUD's new conditions parrot at least six Executive Orders:

    a. E.O.s 14151 and 14173 ("the DEI E.O.s"), which call for "the termination" of all "illegal DEI" "activities" and programs. Exhibits D and E.

    b. E.O. 14168 ("the Gender Ideology E.O."), Exhibit F, which declares as federal policy that there are only two sexes and condemns all policies or practices that "promote or otherwise inculcate" "gender ideology," which the E.O. defines as follows:

    > "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

    c. E.O. 14182 ("the Reproductive Rights E.O."), which calls for ending the use of taxpayer dollars to fund or "promote" "elective abortion." Exhibit G.

    d. E.O.s 14218 and 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025) ("the Immigration E.O.s"), which call for ensuring that Federal payments to States and localities "do not, by design or effect, facilitate the subsidization or promotion of illegal immigration or abet so-called 'sanctuary' policies" and ending "access to Federal funds" for "'sanctuary jurisdictions.'" Exhibits H and I.

19. It is black letter law that conditions attached to the receipt of federal funds must be unambiguous. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). But HUD's new DEI, Gender Ideology, Immigration, and Reproductive Rights Certifications are not. Neither the E.O.s, HUD's notices, or HUD's Application form (SF-424) define:

    a. DEI "activities" or "DEI" itself.

    b. What it means to "inculcate" or "promote" "Gender Ideology."

    c. What it means to "promote" elective abortion or what qualifies as an "elective" abortion.

    d. What it means to "promote" illegal immigration or "abet" "sanctuary" policies.

6

20. Neither HUD's notices, HUD's Application, nor the E.O.s give the CHA fair notice of the conduct they forbid, what it takes to comply, or why HUD considers any purportedly forbidden conduct to be unlawful. The vagueness of these documents encourages and enables arbitrary and discriminatory enforcement based on officials' whims, unconstitutionally unconstrained by guidance or standards. And these uncertainties have only been compounded by further statements by federal officials. For example, a February 5, 2025 letter from Attorney General Pam Bondi to DOJ employees described "illegal DEI" activity, which HUD's Certifications would now prohibit, as any activity that "divide[s] individuals based on race or sex"—a definition that is so sweeping and vague that it cannot mean what it says, as it is broad enough to prohibit affinity groups or separate bathrooms for men and women.

21. The vagueness and overbreadth of HUD's new conditions, which HUD now demands that the CHA accept and certify compliance with, place the Authority in an untenable position. The CHA must either refuse to certify and sign, lose essential funding, and dramatically curtail services that provide housing for more than 132,000 residents; or it must certify and sign without knowing what HUD's conditions mean, or what policies or conduct HUD might later construe as violating them. The latter course would expose the CHA to the risk that HUD will subsequently: (a) accuse the Authority of violating its certifications based on HUD officials' own (and never before disclosed) post-hoc interpretations; (b) revoke critical funding; and (c) pursue treble damages under the False Claims Act—with "materiality," an otherwise "demanding" element of an FCA claim, *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016), arguably conceded by virtue of HUD's required False Claims Act certification.

22. In the past, the CHA has routinely certified compliance with federal nondiscrimination laws as a condition of federal funding. This is different. Now HUD is demanding compliance with

7

the administration's interpretation of what federal nondiscrimination law, immigration law, and the Hyde Amendment mean, whether or not consistent with the applicable statutes or the Constitution as interpreted by the courts.

23. HUD seeks to coerce the CHA into agreeing to a gauntlet of vague and overbroad conditions, drawn from sweeping Executive Orders that are unsupported by, and often contradict, existing statutes and published regulations, and none of which have gone through notice-and-comment rulemaking. What is more, even if they had gone through notice-and-comment rulemaking, these certifications would still be beyond the Executive branch's power to impose. Among other defects, they run afoul of law declaring conditions illegitimate when they are unrelated to the federal interests in the programs to which the conditions are attached. *South Dakota v. Dole*, 483 U.S. at 207-08. Moreover, with or without an Executive Order, agencies have no authority to declare, let alone amend, binding federal law by fiat—particularly on issues of vast economic or political significance. *West Virginia v. EPA*¸ 142 S. Ct. 2587 (2022) (applying the "Major Questions" doctrine).

24. Neither the text of Title VI nor any other federal statute prohibits conduct or speech related to "diversity," "equity," or "inclusion." Neither the Hyde Amendment nor any other statute prohibits "promoting" abortion. And no law authorizes withholding funds from "sanctuary" jurisdictions or prohibiting conduct that merely "by effect" might unintentionally "facilitate" the subsidization or the "promotion" of illegal immigration. These purported restrictions are hopelessly vague, undefined, and impossible to comply with. Absent specific and unmistakable congressional authorization, HUD's imposition of these conditions is *ultra vires*.

25. Separately, HUD's new certifications attempt—without congressional authorization—to radically change federal law by naked Executive branch fiat. For example:

a. For decades, consistent federal practice has been that HUD prorates assistance for "mixed status" families—households with at least one or more members who are not eligible for federal housing assistance based on their immigration status. Section 214 of the Housing and Community Development Act of 1980, 42 U.S.C. § 1436a(b)(2), explicitly allows such mixed-status families to remain in public housing so long as subsidies are prorated so that only eligible members receive federal assistance. *See also* 42 U.S.C. § 1436a(d)(6). Congress's intent was clear: to keep intact, not separate, mixed-status families, while not using federal funds to subsidize a resident without documented immigration status. Despite that, HUD's new Immigration Certifications upend that policy by prohibiting prorated assistance and by requiring all noncitizen family members to be verified under USCIS's Systematic Alien Verification for Entitlements (SAVE) system—regardless of whether they're all applying for benefits—forcing mixed-status families to choose between staying together and forfeiting housing assistance. By HUD's own analysis there are more than 25,000 mixed-status households that currently receive assistance throughout the United States, including 55,000 children. And importantly, the sweeping and vague requirement that the CHA not use federal funds "in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation," could be construed to commandeer CHA to investigate the immigration status of every member of every household, lest it be accused of acting in a manner that has the "effect" of "facilitating" or "promoting" illegal immigration or "shielding" individuals from deportation.

b. For decades, the Hyde Amendment has prohibited using federal funds "for any abortion" or "for health benefits coverage that includes coverage for abortion," subject to

9

narrow exceptions for rape, incest, or preserving the life of the mother. HUD's new Reproductive Rights Conditions purport to enforce the Hyde Amendment but in fact expand it—barring HUD funds from being used to "promote" "elective" abortions. Although the CHA obviously does not perform abortions, some of its employees or residents may choose to terminate a pregnancy, which is legal in Illinois. The vagueness of this condition creates doubt about whether even inaction by the CHA might constitute "promoting" "elective" abortion—if, for example, the CHA merely becomes aware of employees or residents obtaining abortions, or allows an employee to take a sick day, or becomes aware of residents distributing reproductive rights information in meetings held on CHA property.

    c.    In contradiction of the DEI Certification, HUD's own regulations expressly require consideration of race or sex in certain contexts, including: (1) the agency's Violence Against Women Act (VAWA) rule, which mandates that housing providers establish emergency transfer plans for tenants, including noncitizens, who are victims of domestic violence, dating violence, sexual assault, or stalking. 24 C.F.R. § 5.2005(e); and (2) HUD's rule requiring that minority- and women-owned businesses receive consideration consistent with 2 C.F.R. § 200.321. On its face, HUD's new DEI Condition contradicts these regulations.

    d.    In conflict with the Gender Ideology Certification, the Supreme Court's decision in *Bostock v. Clayton*, 590 U.S. 644 (2020), held that an employer who fires an individual merely for being gay or transgender discriminates "because of sex," in violation of Title VII. By contrast, HUD's Gender Ideology Certification, defining "sex" as exclusively either male or female, implies that discrimination based on gender identity is

10

not sex discrimination. Thus, this Certification not only does not enforce civil rights laws, it violates them, including HUD's own regulation requiring CHA to treat individuals in accordance with their gender identity. 24 C.F.R. § 5.106.

26. HUD's DEI, Immigration, Gender Ideology, and Reproductive Rights Certifications each represent reversals of established agency policy—an attempt to change the law. And for these Certifications to lawfully take effect, *if* they could be upheld at all, they must first go through formal notice-and-comment rulemaking. 24 C.F.R. § 10.1; 5 U.S.C. § 553. And that rulemaking would have required HUD to consider reliance interests and to provide reasoned explanations for changes. Defendants have done neither.

27. By leveraging federal funding and threatening prosecution and treble damages liability under the False Claims Act, Defendants are unconstitutionally attempting to effect sweeping social and political changes, which have little or nothing to do with housing, through Executive Orders alone, without Congress' involvement.

28. Plaintiffs have no adequate remedy at law.

29. If not enjoined, HUD's new certifications will inflict irreparable harm on the CHA and harm the public, and that harm is irreparable whether the CHA signs or refuses to sign them. These irreparable harms include that:

   a. If the CHA signs the certifications, that will be under duress and coercion, to avoid being deemed to have waived the claims set forth in this Complaint. Yet doing so places it under a Sword of Damocles, as it would have to operate under the threat (1) that its funding might be reduced or clawed back based on accusations that it has violated one of the vague conditions; (2) of being sued for treble damages under the False Claims Act; or (3) of being

sued by a resident or employee for violation of a law with which a Certification conflicts and is otherwise contrary to law.

b. If the CHA does not sign— the pending application or future ones for other HUD funding for other programs—it risks: (1) losing its operating funds, and having to slash and even eliminate its programming, leaving tens of thousands of families and seniors without affordable housing; (2) disrupting the rental housing market in Chicago; (3) depriving hundreds of dedicated public servants now employed by CHA of their livelihoods; (4) destroying CHA's mission of housing needy families; and (5) frustrating Congress's intent to house these families.

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Fifth Amendment Due Process (Vagueness)**

30. Plaintiff repeats and re-alleges paragraphs 1–29.

31. HUD's new DEI, Gender Ideology, Abortion, and Immigration Certifications are unconstitutionally vague—in violation of the Fifth Amendment's Due Process Clause. Because they fail to make clear what conduct they prohibit, they do not provide fair notice of what it takes to comply, while permitting and encouraging arbitrary and discriminatory enforcement.

### SECOND CLAIM FOR RELIEF

**Violation of the APA (Not in Accordance with Law)**

32. Plaintiff repeats and re-alleges paragraphs 1–29.

33. Under the Administrative Procedure Act, this Court "shall" hold unlawful and set aside final agency action found to be "not in accordance with law." 5 U.S.C. § 706(2)(a).

34. HUD's regulations call for notice-and-comment rulemaking "with respect to all HUD programs and functions" even if "such matters would not otherwise be subject to rulemaking by

law or Executive policy." 24 C.F.R. § 10.1. HUD published none of its new certifications on funding in the Federal Register before imposing them.

35. Imposing these conditions is reviewable "final" agency action and imposing them without notice-and-comment rulemaking, in violation of 24 C.F.R. § 10.1, is not in accordance with law.

THIRD CLAIM FOR RELIEF

**Violation of the APA (Arbitrary, Capricious, and an Abuse of Discretion)**

36. Plaintiff repeats and re-alleges paragraphs 1–29.

37. Under the Administrative Procedure Act, this Court "shall" hold unlawful and set aside agency action found to be "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

38. Defendants' adoption and imposition of the DEI, Immigration, Gender Ideology, and Reproductive Rights Conditions are reviewable "final" agency actions and their adoption with no reasoned explanation beyond rote incorporation of the President's E.O.s has been arbitrary and capricious.

FOURTH CLAIM FOR RELIEF

**Tenth Amendment**

39. Plaintiffs repeat and re-allege paragraphs 1–29.

40. The federal government may not leverage changes in the terms of States' or local bodies' longstanding participation in entrenched federal programs, involving large amounts of money on which they have come to rely, by telling them they can continue to participate only if they will yield to conditions so coercive that they amount to economic dragooning, impermissibly aggrandizing federal power at the expense of States and their subdivisions.

13

41. The CHA has received over a billion dollars in annual HUD funding for years, incorporating this money into its budget and spending in reliance on its renewal, providing housing to tens of thousands of needy households. Suddenly attaching novel boundary-pushing conditions to that funding now, after HUD has come to rely on it in providing such housing, is unconstitutionally coercive, impermissibly penalizing CHA's exercise of its Tenth Amendment right to refuse to accede to those conditions.

## FIFTH CLAIM FOR RELIEF

**Ultra Vires**

42. Plaintiffs repeat and re-allege paragraph 1–29.

43. Plaintiffs have a non-statutory right of action to declare unlawful and enjoin government action taken without lawful authority.

44. No statute, part of the Constitution, or other source of law authorizes Defendants' actions alleged above.

## SIXTH CLAIM FOR RELIEF

**Separation of Powers**

45. Plaintiff repeats and re-alleges paragraphs 1–29.

46. Executive branch power is conferred, and limited, by the Constitution and by federal statutes. Under Article I of the Constitution, Congress, not the President and not agencies, makes policy on major questions of economic or political significance. Under Article II of the Constitution, the Executive branch "faithfully execute[s]" the law but does not make it.

47. Without clear congressional authorization, Defendants may not add conditions to federal spending affecting major questions of economic or political significance or that are

unrelated to the federal purposes underlying the statutory programs for which the funding was appropriated, here, funding for public housing.

48. Through their actions alleged above, Defendants have usurped powers that the Constitution vests in Congress, not the Executive, violating separation of powers principles.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks the Court to:

A. Enter a **temporary restraining order** to immediately stay application of HUD's DEI, Gender Ideology, Reproductive Rights, and Immigration Certifications, described in this Complaint, to the CHA, or in the alternative, to stay the deadline for the CHA to submit any application containing such Certifications.

B. Enter **preliminary and permanent injunctions** enjoining Defendants and all others acting in concert or participation with them from:

1. Requiring the CHA to agree to, or otherwise imposing or enforcing, the DEI, Gender Ideology, Reproductive Rights, or Immigrations Certifications described in this Complaint—or any substantively similar conditions—as a requirement for the CHA to receive HUD funding.

2. Retaliating against the CHA for this lawsuit.

C. Declare that Defendants' DEI, Gender Ideology Reproductive Rights, and Immigration Certifications described in this Complaint are unconstitutional, are not authorized by statute, violate the APA, and are unlawful.

D. Order Defendants to file status reports at regular intervals confirming their compliance with this Court's order(s) and judgment(s) in this case.

E. Award Plaintiffs their costs and reasonable attorneys' fees.

F. Grant all additional relief the Court deems just and proper.

Dated: October 16, 2025

                                                Respectfully submitted,

                                                **The Chicago Housing Authority**

                                                /s/ Charles D. Wysong

                                                One of the Counsel for Plaintiff CHA

| | |
|---|---|
| Matthew J. Piers | Edward W. Feldman |
| Caryn C. Lederer | Rachel E. Simon |
| Charles D. Wysong | Miller Shakman Levine & Feldman LLP |
| Hughes Socol Piers | 30 W. Monroe Street, Suite 1900 |
|  Resnick & Dym, Ltd. | Chicago, Illinois 60603 |
| 70 W. Madison St., Suite 4000 | (312) 263-3700 |
| Chicago, Illinois 60602 | efeldman@millershakman.com |
| (312) 580-0100 | rsimon@millershakman.com |
| mpiers@hsplegal.com | |
| clederer@hsplegal.com | |
| cwysong@hsplegal.com | |