IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHICAGO HOUSING AUTHORITY, a municipal corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 1:25-cv-12670 |
| v. | ) ) | |
| SCOTT TURNER, in his official capacity as Secretary of the U.S. Department of Housing and Urban Development; the U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**THE CHICAGO HOUSING AUTHORITY'S MEMORANDUM IN SUPPORT OF ITS
<u>MOTION FOR A TEMPORARY RESTRAINING ORDER</u>**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ....................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................. ii

STATEMENT OF FACTS ................................................................................................... 3

STANDARDS FOR A TEMPORARY RESTRAINING ORDER ................................................. 6

ARGUMENT ..................................................................................................................... 6

    I.     The CHA has standing. ...................................................................................... 6

    II.    The Court has jurisdiction................................................................................. 7

    III.   CHA is likely to succeed on the merits............................................................. 7

        A.   HUD's new DEI, Gender Ideology, Immigration, and Reproductive Rights Certifications are unconstitutionally vague. ...........................................................7

        B.   HUD's new DEI, Gender Ideology, Immigration, and Reproductive Rights Certifications are "not in accordance with law." ......................................................9

    IV.   Plaintiff will suffer irreparable harm in the absence of preliminary relief. .................. 13

    V.    The balance of equities and public interest tilt overwhelmingly in Plaintiff's favor........ 14

CONCLUSION................................................................................................................ 15

## **TABLE OF AUTHORITIES**

**Cases**

*Bostock v. Clayton*,
   590 U.S. 644 (2020)...................................................................................................11

*California v. Dep't of Transp.*,
   No. 25-cv-208-JJM-PAS, 2025 WL 1711531 (D.R.I. June 19, 2025) ........................ 7

*Chicago Women in Trades v. Trump*,
   773 F. Supp. 3d 592 (N.D. Ill. 2025) ........................................................................ 6

*Chicago Women in Trades v. Trump*,
   778 F. Supp. 3d 959 (N.D. Ill. 2025) ................................................................... 7, 13

*City of Chicago v. Barr*,
   961 F. 3d 882 (7th Cir. 2020)................................................................................... 12

*City of Fresno v. Turner*,
   No. 25-cv-07070-RS, 2025 WL 2721390 (N.D. Cal. Sept. 23, 2025)...................... 14

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*,
   549 F. 3d 1079 (7th Cir. 2008)................................................................................... 7

*King v. Burwell*,
   576 U.S. 473 (2015)................................................................................................. 12

*Kisor v. Wilkie*,
   588 U.S. 558 (2019) ................................................................................................ 10

*League of Women Voters of U.S. v. Newby*,
   838 F. 3d 1 (D.C. Cir. 2016)..................................................................................... 15

*Martin Luther King, Jr. Cnty. v. Turner*,
   785 F. Supp. 3d 863 (W.D. Wash. 2025)................................................................... 7

*Martin Luther King, Jr. Cnty. v. Turner*,
   No. 2:25-cv-814, 2025 WL 2322763 (W.D. Wash. Aug. 12, 2015)......................... 14

*Nat'l All. to End Homelessness v. Turner*,
   No. 25-cv-00447, 2025 WL 2638377 (D.R.I. Sept. 14, 2025)................................. 14

*Nat'l Assoc. of Diversity Officers in Higher Educ. v. Trump*,
   767 F. Supp. 3d 243 (D. Md. 2025) ......................................................................... 10

*New York v. United States*,
   505 U.S. 144 (1992).................................................................................................. 12

ii

*Rhode Island Coalition Against Domestic Violence v. Bondi*,
No. CV 25-279 WES, 2025 WL 2271867 (D.R.I. Aug. 8, 2025) ............................................... 7

*Rhode Island Coalition Against Domestic Violence v. Kennedy*,
No. 25-cv-342-MRD-PAS, 2025 WL 2899764 (D.R.I. Oct. 10, 2025) ................................... 14

*Rodriguez v. Robbins*,
715 F. 3d 1127 (9th Cir. 2013) ............................................................................................ 15

*San Francisco A.I.D.S. Found. v. Trump*,
786 F. Supp. 3d 1184 (N.D. Cal. 2025).............................................................................. 7, 14

*San Francisco Unified Sch. Dist. v. AmeriCorps,*
784 F. Supp. 3d 1280 (N.D. Cal. 2025) .................................................................................. 7

*NFIB v. Sebelius*,
567 U.S. 519 (2012)............................................................................................................. 12

*South Dakota v. Dole*,
483 U.S. 203 (1987).............................................................................................................. 7

*United States ex rel. Accardi v. Shaughnessy*,
347 U.S. 260 (1954).............................................................................................................. 9

*West Virginia v. EPA*,
597 U.S. 597 (2022).............................................................................................................. 12

**Statutes**

5 U.S.C. § 705.................................................................................................................... 13

5 U.S.C. § 706.................................................................................................................... 9

28 U.S.C. § 1331................................................................................................................ 7

28 U.S.C. § 1346................................................................................................................ 7

31 U.S.C. § 3730................................................................................................................ 8

42 U.S.C. § 1436a...............................................................................................................11

**Regulations**

2 C.F.R. § 200.321 .............................................................................................................. 10

24 C.F.R. § 5.2005 .............................................................................................................. 10

24 C.F.R. § 10.1 .................................................................................................................. 10

iii

The United States Department of Housing and Urban Development (HUD) seeks to coerce the Chicago Housing Authority (CHA) to accede to new and unconstitutional terms, lifted wholesale from several of presidential Executive Orders, as the price of continued federal funding. Several other courts across the country have recently enjoined several federal agencies, including HUD, from requiring these certifications as a precondition to federal funding. The CHA urges this Court to do the same.

As a prerequisite to the CHA receiving funding for Fiscal Year 2026, funding that the CHA has received from HUD for decades, HUD is demanding that the CHA certify, among other things, that it will comply with the following vague and undefined conditions:

(a) Prohibit all kinds of "DEI," on pain of False Claims Act liability and harsh sanction (**"the DEI Certifications"**);

(b) Facilitate immigration enforcement through a variety of measures, including by discontinuing housing assistance to "mixed-status" families even though federal law expressly authorizes housing assistance for mixed-status families on a prorated basis (**"the Immigration Certifications"**);

(c) Avoid "promoting" "gender ideology" (**"the Gender Ideology Certification"**); and

(d) Avoid "promoting" "elective" abortion (**"the Reproductive Rights Certification"**).

These newly imposed certifications are unlawful in numerous respects. They are unconstitutionally vague; they never went through notice-and-comment rulemaking, as required; they are inconsistent with both past practice and existing law; HUD has neither provided a reasoned explanation for them nor accounted for the CHA's decades-long reliance on federal funding, which provides more than 95% of the Authority's budgeted operating expenses; and these new conditions constitute an unconstitutional attempt to bypass bicameralism and presentment and cut out Congress altogether—to govern instead by Executive Order, without statutory authority. As shown below, Plaintiff is likely to prevail on the merits of every one of these contentions.

The new certifications are as harmful as they are unlawful. If implemented, they would inflict irreparable harm on the CHA for which there is no adequate remedy at law. Among other harms, the CHA would be subject to arbitrary and wholly subjective enforcement of vague and indeterminate requirements that could not only cut off funding for housing thousands of needy Chicagoans but also expose the CHA to treble damage penalties. Any attempt to comply with the certifications themselves would paralyze the CHA and put it in the impossible position of guessing about whether and how to comply with the blatantly unlawful certifications. The alternative—to forgo federal funding—would be an existential catastrophe for the CHA as an organization and its operations, a cruel blow for tens of thousands of households in Chicago that rely on stable federal funding for housing support, and an extreme peril to the rental housing market of Chicago.

Time is of the essence. **HUD has set a deadline of October 21, 2025 for the CHA to accede and provide unlawful certifications—**with the pending shutdown impeding efforts to pursue an agreement to postpone that deadline for this dispute. Plaintiff therefore asks the Court to:

(a) Enter a TRO immediately restraining Defendants from:

    i.    Requiring the CHA to agree to or provide HUD's announced DEI, Immigration, Gender Ideology, Reproductive Rights Certifications, or any substantively similar certifications, pending further order of the Court;

    ii.    Withholding funding from the CHA based on its not having agreed to these or similar certifications;

    iii.    Initiating any False Claims Act action against the CHA for certifying or not certifying its compliance with the DEI, Gender Ideology, Immigration, Reproductive Rights Certifications or substantively similar conditions;

    iv.    Retaliating against Plaintiff for filing this lawsuit; and

(b) Set a briefing schedule on whether to convert a TRO to a preliminary injunction and a hearing (if necessary).

2

**STATEMENT OF FACTS**

The following facts are supported by the Declaration of Matthew Brewer, Acting Chairman of CHA, submitted as Exhibit 1 to this brief. We believe these facts will be undisputed.

The CHA is the third-largest public housing authority in the country and the largest single owner of rental housing in Chicago. As a landlord, the CHA provides housing for more than 12,100 households, comprising more than 21,000 residents. Additionally, the CHA receives federal funds to subsidize housing provided by private landlords through vouchers. These funds subsidize another 53,000 households with about 110,000 residents of Chicago. CHA receives over 95% of its budgeted operating expenses from HUD. Because of HUD's demand that CHA provide new certifications as a requirement for continuing funding, much or all of that funding is at risk.

The most imminent risk is to the operating subsidies that CHA needs to continue leasing public housing units to tenants. CHA has received that funding from HUD annually for decades pursuant to a HUD contract that goes back to the 1990s. To obtain it each year, CHA submits to HUD an application. A copy of the 2026 version of that form (HUD Form SF-424) is Exhibit 1.1 to this brief. HUD is now requiring the CHA to fill out and submit this form on or before October 21, 2025 to receive continued federal operating funding for FY 2026. CHA is also seeking millions of dollars in additional HUD funding with deadlines of October 27, 2025 and October 29, 2025.

HUD has drastically changed this form from those it used in prior years. The FY 2026 form demands that CHA make a host of new certifications borrowed from presidential Executive Orders. As shown below, these new certifications are hopelessly vague, unauthorized by Congress, and hastily adopted without notice-and-comment rulemaking. They seek to compel sweeping social change and ideological fealty with vast economic and political consequences by naked Executive Branch fiat—without Congressional authorization and in violation of Due Process, the

3

Administrative Procedure Act (APA), and separation of powers principles. In the FY 2026 Form SF-424, HUD seeks to require the CHA to certify that:

a. The Authority "[s]hall not use grant funds to promote 'gender ideology,' as defined in Executive Order (E.O.) 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*." Exhibit 1.1 ¶ 21(i)(1). This is referred to herein as the "Gender Ideology Certification."

b. The Authority "[s]hall not use any grant funds to fund or promote elective abortions, as required by E.O. 14182, *Enforcing the Hyde Amendment*." *Id*. ¶ 21(i)(4). This is referred to herein as the "Reproductive Rights Certification."

c. The Authority may not use federal grant funding "in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation." *Id*. ¶ 21(k). This condition and other similar conditions contained in HUD publications are referred to herein as the "Immigration Certifications."

d. For purpose of the federal False Claims Act and the treble damages available under that Act, violating in any respect any "Federal anti-discrimination law"—or seemingly the administration's interpretation or characterization of those laws as widely publicized in Executive Order and DOJ correspondence opposing "DEI"—is "material" to the Government's payment decisions. *Id*. ¶ 21(i)(2). This condition along with others regarding DEI and anti-discrimination provisions from HUD announcements are referred to herein as the "DEI Certifications."

In addition to Exhibit 1.1, other more general HUD publications, attached as Exhibits 2 and 3 to this brief, further illuminate the breadth of the specific language in the HUD FY 2026 Form SF-424, Exhibit 1.1, while exacerbating rather than curing their vagueness.

Exhibit 2 contains revisions to agency-wide *Requirements and Terms for HUD's Financial Assistance Programs.* Exhibit 2 is available at https://perma.cc/K5KJ-L8ZF, but no longer publicly available on HUD's website. With certain exceptions, Exhibit 2 shows that, in addition to the terms and conditions required by Exhibit 1.1, HUD's new conditions for continued federal funding for the CHA (and other public housing authorities) may require that:

**"Recipients of Federal Awards must comply with applicable existing and future Executive Orders . . . including but not limited to":**

i. E.O. 14218, 90 Fed. Reg. 10581 (Feb. 19, 2025), which "prohibits taxpayers' resources and benefits from going to unqualified aliens." Exhibit 2 at No. 24 (another one of the Immigration Certifications).

ii. E.O. 14182, 90 Fed. Reg. 8751 (Jan. 24, 2025), which "prohibits the use of Federal taxpayer dollars to fund or promote elective abortion." *Id.* (Reproductive Rights Certification).

iii. E.O. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025), which "sets forth U.S. policy recognizing two sexes, males and female." *Id.* (Gender Ideology Certification).

iv. E.O. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025), which calls for "the termination" of "all discriminatory programs and activities," particularly illegal "DEI" programs. *Id.* (one of the DEI Certifications).

v. A requirement that recipients "must administer" awards "in accordance with all applicable immigration restrictions and requirements" and may not use HUD funding "in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation." *Id.* at No. 4 (another one of the Immigration Certifications).

HUD has also issued yet a further notice (Exhibit 3) on its website, stating again that signing an application for federal funds (including presumably Form SF-424) will constitute a certification that a public housing agency "shall not":

a. "[U]se grant funds to promote 'gender ideology,' as defined in Executive Order (E.O.) 14168" (the Gender Ideology Certification).

b. "[U]se any grant funds to fund or promote elective abortions, as required by E.O. 14182" (the Reproductive Rights Certification).

c. "[U]se . . . funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation" (another one of the Immigration Certifications).

Exhibit 3 also states that signing and submitting a form SF-424 Application will:

d. Certify that the agency will "administer its grant in accordance with all application immigration restrictions and requirements … [and] prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States" (another one of the Immigration Certifications), and

5

e. Stipulate that "compliance, in all respects, with all applicable Federal anti-discrimination laws is 'material' to the U.S. Government's payment decisions for purposes of" the federal False Claims Act (one of the DEI Certifications).

HUD did not make the new Form SF-424 application (Exhibit 1.1) available to CHA until September 17, 2025. Exhibit 1, ¶ 19. Currently, unless CHA signs and submits that form by October 21, 2025, certifying—according to the form itself and Exhibit 3—that it will comply with HUD's new DEI, Gender Ideology, Immigration, and Reproductive Rights Certifications, then it will lose duly appropriated federal funding, imperiling housing for tens of thousands of CHA residents. Likewise, CHA is seeking millions of dollars of additional HUD funding through two additional grants subject to HUD certification requirements with application deadlines of October 27, 2025 and October 29, 2025. Exhibit 1, ¶¶ 27-30.

## STANDARDS FOR A TEMPORARY RESTRAINING ORDER

Once jurisdiction and standing are established, the Court may enter a temporary restraining order—or a preliminary injunction, the requirements are the same—when the moving party shows that it "is likely to succeed on the merits, . . . likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Chicago Women in Trades v. Trump*, 773 F. Supp. 3d 592, 603-04 (N.D. Ill. 2025) (quoting *Bevis v. City of Naperville,* 85 F. 4th 1175, 1188 (7th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008))).

Because CHA meets these factors, the Court should enter the requested TRO.

## ARGUMENT

### I. The CHA has standing.

Standing is indisputable here. HUD has threatened the CHA with a loss of hundreds of millions of dollars of federal funding if it does not commit to a host of vague and unlawful demands and expose itself to potential treble damages liability. The funds requested in the pending FY 2026

6

Form SF-424 support CHA's public housing program for over 20,000 residents and without it, CHA cannot continue operating that program. More generally, CHA is fully dependent on HUD funding to operate and house over 130,000 residents of Chicago, or even to exist. All told, HUD funding constitutes over 95% of the CHA's budgeted operating expenses, which HUD has announced will be subject to the new unlawful requirements. This is a classic "pocketbook," "loss of funds" injury. Injury-in-fact sufficient to establish Article III standing is manifest.

## II. The Court has jurisdiction.

This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1346(a)(2). That jurisdiction is not ousted or precluded by the Tucker Act. *See Chicago Women in Trades v. Trump*, 778 F. Supp. 3d 959, 980–82 (N.D. Ill. 2025).[1]

## III. The CHA is likely to succeed on the merits.

Although a plaintiff need only show a likelihood of success on at least one claim, *see Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F. 3d 1079, 1096 (7th Cir. 2008), Plaintiff is likely to succeed on all of its claims here.

### A. HUD's new DEI, Gender Ideology, Immigration, and Reproductive Rights Certifications are unconstitutionally vague.

It is black letter law that conditions attached to federal funds must be unambiguous. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). But HUD's new certifications are anything but. Violating the Fifth Amendment's Due Process Clause, they are unconstitutionally vague.

---

[1] *Accord Rhode Island Coalition Against Domestic Violence v. Bondi,* No. CV 25-279 WES, 2025 WL 2271867, at *5 (D.R.I. Aug. 8, 2025); *California v. Dep't of Transp.*, No. 25-cv-208-JJM-PAS, --- F. Supp. 3d ----, 2025 WL 1711531, at *1 (D.R.I. June 19, 2025); *San Francisco A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184, 1212 (N.D. Cal. 2025); *Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 877-82 (W.D. Wash. 2025); *San Francisco Unified Sch. Dist. v. AmeriCorps,* 784 F. Supp. 3d 1280, 1291-96 (N.D. Cal. 2025).

For example, the <u>DEI Certifications</u> require "termination" of all illegal "DEI" "activities," without defining either term, creating precisely the kind of uncertainty Due Process forbids. HUD gives no clue, for example, whether CHA might violate the certification by posting about Black History Month on social media, allowing employees to form a book club focused on disability, commemorating the legendary public housing advocate Jane Addams (because she is a woman and/or because she had a lifelong intimate relationship with another woman), or allowing employees to specify pronouns in their email signatures. CHA's multitude of interactions with tenants, choices as a landlord, employment decisions, and even physical space might (or might not) be swept up in such vague pronouncements and language.

It gets worse: The demand that CHA certify compliance with "anti-discrimination laws" (also without defining what HUD or the current administration would consider violating those laws) as "material" for purposes of the False Claims Act, creates exposure to that Act's treble damages penalties. 31 U.S.C. § 3730(a)(1)(G). The addition of the False Claims Act places the "anti-DEI" requirements on steroids, drastically increasing the threat of punishment for violating the Administration's preferences or whims about what constitutes a "violation."

The <u>Gender Ideology Certification</u> purports bar any practices that "promote or otherwise inculcate" "gender ideology" without defining those terms. CHA thus cannot know whether, for example, it may violate the certification if it provides housing assistance to transgender residents, maintains gender-neutral bathrooms, provides insurance for gender-affirming care, or investigates harassment (against residents or employees) based on gender identity.

The <u>Immigration Certifications</u> forbid activities that "by design or effect facilitate the subsidization or promotion of illegal immigration or abet so-called 'sanctuary policies,'" again without definitions. Thus, the CHA cannot know if it might violate these certifications by requiring

8

ICE agents to show judicial warrants before entering CHA buildings (as the 4th Amendment allows), by housing undocumented tenants (as HUD regulations allow), by employing DACA recipients, or by declining to notify ICE if it suspects a tenant's undocumented status.

The Reproductive Rights Certification bans using funds or actions that "promote" "elective" abortions—without defining either term. CHA cannot know, for example, whether any of the following might violate the certification: offering coverage for abortion services in CHA employee health plans, permitting employees to use sick days to seek abortion counseling or care, or allowing residents to place Planned Parenthood materials in common areas

In sum, HUD's new certifications are fatally unbounded and vague. None provides fair notice of the conduct they forbid or how to comply. They encourage and enable, in turn, arbitrary and discriminatory enforcement, based on officials' whims, unconstrained by guidance or standards.

Therefore, CHA's first claim—asserting that Defendants' new certifications violate the Fifth Amendment's Due Process Clause—is likely to succeed.

B. HUD's new DEI, Gender Ideology, Immigration, and Reproductive Rights Certifications are "not in accordance with law."

Under the Administrative Procedure Act, courts "shall" hold unlawful and set aside final agency action found to be "not in accordance with law." 5 U.S.C. § 706(2)(a). HUD's DEI, Gender Ideology, Immigration, and Reproductive Rights Certifications are "not in accordance with law" for several reasons.

*First*, they are unconstitutionally vague (as shown above). *See* Compl. ¶¶ 30-31 (First Claim for Relief).

*Second*, federal agencies are required to follow their own regulations. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954). HUD regulations require the agency to go through notice-and-comment rulemaking with respect to rulemaking for all HUD programs and

9

functions, including matters that relate to funding, even if "such matters would not otherwise be subject to rulemaking by law or Executive policy." 24 C.F.R. § 10.1. HUD's new certifications are substantive rules, impose obligations, and effect changes in existing law. They are therefore subject to notice and comment procedures under 24 C.F.R. § 10.1. *See Kisor v. Wilkie*, 588 U.S. 558, 584 (2019) (explaining that legislative rules, which impose "legally binding requirements," "must go through notice and comment" to be valid). Yet HUD has submitted none of these certifications to notice-and-comment rulemaking, rendering them unlawful under HUD's own regulations. *See* Compl. ¶¶ 32-35 (Second Claim for Relief).

*Third*, HUD's Certifications are also substantively "not in accordance with law." *See id.* (Second Claim for Relief). As examples:

a.  The DEI Certifications contradict HUD regulations that require consideration of race or sex. HUD's Violence Against Women rule, for example, requires housing providers to establish emergency transfer plans for women who are tenants and have been victims of domestic violence, dating violence, sexual assault, or stalking. 24 C.F.R. § 5.2005(e). And HUD's M/WBE regulations mandate giving minority and women-owned enterprises the consideration required by 2 C.F.R. § 200.321. The DEI Certifications, requiring CHA to certify its compliance with HUD's new and changing interpretations of equal protection, also likely constitutes viewpoint discrimination in violation of the First Amendment. *See Nat'l Assoc. of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 281 (D. Md. 2025) (DEI certification requirement likely violated the First Amendment because on its face it constitutes a content-based restriction on speech).

b.  The Gender Ideology Certification, defining "sex" as exclusively either male or female, implies that transgender and non-binary people do not exist, and thus that gender-identity-based discrimination is not sex discrimination. This view (which has nothing to do with public housing)

10

conflicts with the Supreme Court's decision in *Bostock v. Clayton*, 590 U.S. 644 (2020), which held that an employer who fires an individual merely for being gay or transgender violates Title VII by discriminating on the basis of "sex."

c. The Immigration Certifications contradict Section 214 of the Housing and Community Development Act of 1980, 42 U.S.C. § 1436a(b)(2), which provides that "mixed-status" families (i.e. where different family members have different immigration or citizen statuses, such as a mix of citizen and non-citizen individuals) may reside together in HUD-funded housing as long as their subsidies are prorated. *See also id.* § 1436a(d)(6). Congress's clear intent was not to separate mixed-status families or bar them from participating in federal housing programs.

d. The Reproductive Rights Certification, prohibiting actions to "promote" "elective" abortions, imposes a "gag rule" on abortion access, going beyond the Hyde Amendment. As drafted, the certification appears to prohibit allowing an employee leave for an abortion and related healthcare even if the leave was protected and required by the Family Medical Leave Act.

*Fourth*, HUD has adopted and imposed the DEI, Immigration, Gender Ideology, and Reproductive Rights Certifications—all of them reviewable "final" agency actions—largely by rote incorporation of Executive Orders, without reasoned explanation and without considering the CHA's (and other public housing agencies') extensive reliance on renewed funding for their survival and ability to provide housing assistance. Adopting and imposing these certifications without reasoned explanation and accounting for reliance interests is arbitrary and capricious and therefore a violation of the APA. *See* Compl. ¶¶ 36-38 (Third Claim for Relief).

*Fifth*, the federal government may not leverage changes in the terms for participation in longstanding federal programs, involving large amounts of money on which state and local authorities rely, by telling them they can continue to receive the money only if they will yield to

11

conditions so coercive that they amount to constitutionally prohibited "economic dragooning." *NFIB v. Sebelius*, 567 U.S. 519, 582 (2012). *See* Compl. ¶¶ 39-41 (Fourth Claim for Relief).

*Sixth,* under Article I of the Constitution, agencies only have the powers and authority granted by Congress. No statute authorizes HUD to impose any of the DEI, Gender Ideology, Immigration, and Reproductive Rights Certifications on CHA or to condition federal funding authorized and provided by Congress, year after year for decades, on these novel and illegal certifications. *See, e.g., City of Chicago v. Barr*, 961 F. 3d 882 (7th Cir. 2020) (striking immigration conditions on DOJ public safety funding as having no statutory authorization or basis). In addition, even when authorized by Congress, conditions on federal grants must be related to the federal purpose for funding the particular program. *New York v. United States*, 505 U.S. 144, 167 (1992). The certifications here stray far from the goal of housing needy families and seniors.

Moreover, the Supreme Court has emphasized that administrative agencies like HUD may not add conditions to federal spending affecting major questions of economic or political significance. *See West Virginia v. EPA*, 597 U.S. 597 (2022) (applying the "major questions doctrine"); *King v. Burwell*, 576 U.S. 473, 486 (2015) (had Congress wished to assign a question of "deep economic and political significance" to an agency, "it surely would have done so expressly," especially on issues where the agency has no expertise). Congress, not the President and not agencies, sets policy on questions of major economic or political significance. *Id.*

HUD's new Certifications are not authorized by any statute at all. In addition, they affect major questions of economic and political significance and cannot be imposed without the involvement of Congress. *See* Compl. ¶¶ 42-48 (Fifth and Sixth Claims for Relief).

12

**IV.     Plaintiff will suffer irreparable harm in the absence of preliminary relief.**

Preliminary relief is appropriate "to postpone the effective date of an agency action" and to "preserve status or rights pending conclusion of the review proceedings" when "necessary to prevent irreparable injury." 5 U.S.C. § 705. The irreparable harms that the CHA faces here unless HUD is enjoined from imposing its new conditions on continued funding take several forms.

*First*, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Chicago Women in Trades*, 778 F. Supp. 3d at 993 (quoting *Ezell v. City of Chicago*, 651 F. 3d 684, 699 (7th Cir. 2011) (quoting 11A Charles Alan Wright, et al. Federal Practice and Procedure § 2948.1 (2d ed. 1995))). "This is especially true when the right in question 'protects . . . intangible and unquantifiable interests.'" *Id.* (quoting *Ezell*, 651 F. 3d at 699). "The separation of powers"—implicated here by the Executive Branch's adoption and imposition of funding conditions not authorized by Congress—"is one such interest." *Id.* "Thus, no further showing of irreparable injury or adequacy of legal remedies is required." *Id.*

*Second*, CHA faces losing access to critical federal funds that provide virtually all of the revenue that allows CHA to operate. Without relief from the demanded certifications, CHA cannot access essential federal funding, including the operating subsidy that funds nearly all of its traditional public housing for more than 20,000 residents, a third of them children and many thousands of them senior citizens. Without federal funding, CHA would collapse and cease to operate, ultimately jeopardizing the housing for more than 130,000 Chicago residents, risking the physical and human infrastructure developed over decades, and putting the many property managers and thousands of landlords that rely on CHA funds at risk. As the largest landlord and largest provider of rental subsidies in Chicago, undercutting the housing of more than 130,000 renters would send both residents and the rental market in Chicago into chaos.

13

*Third*, disruption of federal funds to CHA would irreparably harm the organization itself. Without federal funding, the CHA would have no revenue for any of its operations, including overseeing the hundreds of buildings it owns in Chicago, or to pay the contractors, vendors, and landlords who depend on revenue from voucher subsidies and other programs. Even losses of a substantial *portion* of HUD funding or funding delays could lead to CHA layoffs. CHA employees nearly 600 people, including many with long tenure, and their institutional knowledge and technical skills would be nearly impossible to replace.

Indeed, several district courts have already acknowledged the irreparable harm that HUD's new conditions are imposing on public housing agencies and their residents. *See Rhode Island Coalition Against Domestic Violence v. Kennedy*, No. 25-cv-342-MRD-PAS, 2025 WL 2899764, at *11 (D.R.I. Oct. 10, 2025); *City of Fresno v. Turner*, No. 25-cv-07070-RS, 2025 WL 2721390, at * 19 (N.D. Cal. Sept. 23, 2025); *Nat'l All. to End Homelessness v. Turner*, No. 25-cv-00447, 2025 WL 2638377, at *1 (D.R.I. Sept. 14, 2025); *Martin Luther King, Jr. Cnty. v. Turner,* No. 2:25-cv-814, --- F. Supp. 3d ----, 2025 WL 2322763, at *16 (W.D. Wash. Aug. 12, 2015); *see also San Francisco A.I.D.S. Found.*, 786 F. Supp. 3d at 1233 (N.D. Cal. 2025) (enjoining funding restrictions directed by Executive Orders). This Court should do the same.

**V.      The balance of equities and public interest tilt overwhelmingly in Plaintiff's favor.**

The Government cannot suffer harm from an injunction that merely ends an unlawful practice of illegal certification conditions, let alone a TRO that allows CHA to submit funding paperwork pending further litigation or that stays the deadline. Likewise, there is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is substantial public interest in having governmental agencies abide by federal laws. In addition, the public interest is served by allowing CHA to continue housing its residents, not threatening them with homelessness due

14

to HUD's withholding funding. Finally, and axiomatically, CHA is likely to prevail on constitutional and statutory claims against a government defendant, thereby serving the public interest. *See League of Women Voters of U.S. v. Newby*, 838 F. 3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."); *Rodriguez v. Robbins*, 715 F. 3d 1127, 1145 (9th Cir. 2013) (the government "cannot suffer harm form an injunction that merely ends an unlawful practice").

## CONCLUSION

The Court should enter a TRO immediately restraining Defendants from imposing their announced DEI, Gender Ideology, Reproductive Rights, and Immigration Conditions—or any other substantively similar conditions—on the CHA's continued receipt of federal funding. The Order should lift the certification mandate so that CHA can apply for continued federal funding on time during the pendency of the TRO, including for the upcoming October 21, 2025, October 27, 2025, and October 29, 2025 deadlines, and set a briefing schedule on whether to convert a TRO to a preliminary injunction, and schedule a hearing on that motion (if necessary).

Dated: October 16, 2025

Respectfully submitted,

**The Chicago Housing Authority**

/s    Charles D. Wysong
One of the Attorneys for Plaintiff CHA

Matthew J. Piers
Caryn C. Lederer
Charles D. Wysong
Hughes Socol Piers
  Resnick & Dym, Ltd.
70 W. Madison St., Suite 4000
Chicago, Illinois 60602
(312) 580-0100
mpiers@hsplegal.com
clederer@hsplegal.com
cwysong@hsplegal.com

Edward W. Feldman
Rachel Ellen Simon
Miller Shakman Levine & Feldman LLP
30 W. Monroe Street, Suite 1900
Chicago, Illinois 60603
(312) 263-3700
efeldman@millershakman.com
rsimon@millershakman.com

15