**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CHICAGO HOUSING AUTHORITY<br><br>Plaintiff,<br><br>v.<br><br>SCOTT TURNER, in his official capacity as Secretary of the U.S. Department of Housing and Urban Development; U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,<br><br>Defendants. | Case No. 1:25-cv-12670<br><br>Judge Martha M. Pacold |

**ORDER**

Plaintiff's motion [7][1] for a temporary restraining order is denied for the reasons stated below.

**BACKGROUND AND ANALYSIS**

On Thursday, October 16, 2025, at about 5:00 pm, the Chicago Housing Authority ("CHA") filed this lawsuit. [1]. The next day, Friday, October 17, 2025, the case was assigned to the undersigned. The court held a hearing this morning, Monday, October 20, 2025. The CHA requests a temporary restraining order, in addition to declaratory and injunctive relief, on certifications regarding federal funding it wishes to receive. As summarized in the complaint, the challenged certifications require that in exchange for federal funding, the CHA must certify that it will prohibit activity related to diversity, equity, and inclusion ("DEI") initiatives, at the potential risk of False Claims Act liability; facilitate immigration enforcement; avoid promoting "gender ideology"; and avoid promoting "elective abortion." [1] ¶ 2. The TRO is justified, the CHA argues, because if the court does not restrain the challenged certifications by October 21, 2025, CHA faces an impossible choice: forfeit millions of dollars in federal funding, or agree to allegedly vague, unconstitutional,

---

[1] Bracketed numbers refer to docket entries and are followed by page and / or paragraph number citations. Page numbers refer to the CM/ECF page number.

and improperly promulgated certifications required by the United States Department of Housing and Urban Development ("HUD").

The court begins with the applicable legal standard. The standard for a TRO is undertheorized. The CHA asserts that the standards for a TRO and a preliminary injunction are identical. [8] at 10. The Seventh Circuit has said as much in nonprecedential opinions, *see Wagner v. Williford*, No. 89-1696, 1991 WL 59440, at *2 (7th Cir. Apr. 18, 1991) (unpublished), and other courts have intimated the same, *see Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). If that is correct, a court may exercise its equitable powers to grant a TRO if four conditions are met: "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

Treating TROs in a similar fashion to injunctions is logical. To start, TROs are a subspecies of injunctive relief, so considering the same factors is sensible. *See, e.g.*, *Granny Goose Foods, Inc. v. Bhd. of Teamsters Local No. 70*, 415 U.S. 423, 434–35 (1974) (specifically describing a TRO as a type of injunction); Tyler B. Lindley, Morgan Bronson & Wesley White, *Appealing Temporary Restraining Orders*, 77 Fla. L. Rev. 973, 980 (2025) (as an original matter, "TROs were injunctions, but they were a special kind of injunction—distinguishable from ordinary interlocutory injunctions in their notice, length, and purpose." (footnote omitted)). That a TRO is a form of injunction has become increasingly clear in recent years in the Supreme Court's review of TROs. Traditionally, TROs are unappealable orders while preliminary (and permanent) injunctions are not. *Chi. United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 943 (7th Cir. 2006) (citing 28 U.S.C. § 1292(a)(1)). That said, TROs are so related to preliminary injunctions that, when they bear the "hallmarks of a preliminary injunction," the former may blossom into the latter and become appealable. *See, e.g.*, *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam); *see also Illinois v. Trump*, No. 25-2798, 2025 WL 2937065, at *4 (7th Cir. Oct. 16, 2025). The line between the two is thin.

But there is a line. TROs are not preliminary injunctions, so their differences must be discussed. TROs are different in two key respects. The first is that they can (though need not always) be granted *ex parte*, whereas the grant of a preliminary injunction demands notice and the opportunity to be heard. Fed. R. Civ. P. 65; *see also Trump v. CASA, Inc.*, 606 U.S. 831, 842 (2025). For that reason, TROs raise constitutional concerns. *See Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) ("For more than a century the central meaning of procedural due process has been clear: Parties whose rights are to be affected are entitled to be heard." (quotation omitted)). And that leads to the second difference—to assuage the tension between the sometimes *ex parte* nature of TROs and constitutional due process, TROs must not be of "indefinite

2

duration." *Chi. United Indus.*, 445 F.3d at 946. Indeed, Fed. R. Civ. P. 65(b)(2) imposes stringent deadlines on how long a TRO may last. And when a TRO lingers for too long, it is treated as an injunction (and therefore becomes reviewable). *See Dep't of Educ.*, 604 U.S. at 651.

The reason for TROs is sensible enough—it is sometimes the case that to "avert irreparable harm to the moving party," expedient relief is necessary. *See Chi. United Indus.*, 445 F.3d at 944. The "underlying purpose" of a TRO is to "preserv[e] the status quo and prevent[] irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods*, 415 U.S. at 439. But TROs have a cost. To start, they can impose significant prejudice to the nonmovant, affecting their rights without any notice or opportunity to be heard. And because TROs are doled out in quick fashion, requests for them are attended by "barebones briefing, no argument, and scarce time for reflection." *Dep't of Educ.*, 604 U.S. at 653 (Kagan, J., dissenting). That, quite obviously, "increases" the "risk of error." *Id.* And while "[s]ometimes," no doubt, courts "must act in that way despite the risk," *see id.*, that does not cause the risk to fade.

With these considerations in mind, the court finds that an adjusted version of the preliminary injunction standard is appropriate in the context of TROs. All four factors—likelihood of success on the merits, likelihood of irreparable harm, the balance of the equities, and the public interest—are surely relevant. *See McCann v. Brady*, 909 F.3d 193, 196 (7th Cir. 2018). But the standard cannot be precisely the same. To start, a want of time and information for decision making gives the court reason to think of the first factor differently. A preliminary injunction may not issue without a showing that the movant "is likely to succeed on the merits" of his case. *Winter*, 555 U.S. at 20. In the context of a TRO, however, a lesser standard is sensible to account for the need to decide quickly and with limited information—though some showing of success on the merits is appropriate. *See McCann*, 909 F.3d at 196. But, and for similar reasons, a higher emphasis on irreparability and other equitable factors is appropriate. While a preliminary injunction only requires a showing that "irreparable harm" "is likely," *Winter*, 555 U.S. at 20, in the context of a TRO the showing ought to be higher. TROs are justified on the grounds that an incredibly severe harm will obtain absent an intervention that vitiates the ordinary adversary process, whether because the TRO is issued entirely *ex parte* or because it is issued with notice but without adequate time for a response. Only a clear showing of irreparable harm justifies that sort of relief.

This adjustment—especially the imposition of a heighted showing of irreparable harm—accords well with the nature of equity jurisprudence. The power to issue injunctive relief such as TROs and preliminary injunctions stems from a court's equity powers. *See, e.g., id.* at 24. That is, for example, why likelihood of success on the merits is not the only factor to be considered. TROs, especially when requested *ex parte* or when the nonmovant has inadequate time to respond, are a grave exercise of power. They are more extreme than the already "extraordinary

remedy" that is a preliminary injunction. *Winter*, 555 U.S. at 24. And "in equity, 'the broader and deeper the remedy the plaintiff wants, the stronger the plaintiff's story needs to be.'" *CASA, Inc.*, 606 U.S. at 854 (quoting Samuel L. Bray & Paul B. Miller, *Getting into Equity*, 97 Notre Dame L. Rev. 1763, 1797 (2022)). TROs, then, demand such a heightened showing of irreparability.[2]

With all that in mind, the court proceeds to evaluate the TRO requested in this case. The CHA's complaint and briefing comprise dozens of pages. *See* [1], [6], & attachments; [7], [8], & attachments. And several courts across the country have granted injunctive relief in cases that bear at least some similarities to this one. *See, e.g.*, *Hous. Auth. of the City & Cnty. of S.F. v. Turner*, No. 25-cv-08859 (N.D. Cal. Oct. 18, 2025); *R.I. Coal. Against Domestic Violence v. Kennedy*, No. 25-cv-342, 2025 WL 2899764, at *12 (D.R.I. Oct. 10, 2025); *City of Fresno v. Turner*, No. 25-cv-07070, 2025 WL 2721390, at *20 (N.D. Cal. Sept. 23, 2025); *Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-cv-814, 2025 WL 2322763, at *21–22 (W.D. Wash. Aug. 12, 2025).

That said, there is at least a meaningful question as to the court's jurisdiction. For purposes of *Winter*, "the 'likelihood of success on the merits' refers to the party's likelihood of success *in the lawsuit before the court*, including both merits *and* jurisdictional issues." *See Am. Fed'n of Teachers v. Bessent*, 152 F.4th 162, 168 n.3 (4th Cir. 2025) (Richardson, J.) (citing *Murthy v. Missouri*, 603 U.S. 43, 58 (2024)). The Court of Federal Claims has exclusive jurisdiction over certain contract claims pursuant to the Tucker Act. *See* 28 U.S.C. §§ 1346(a)(2) & 1491; *see also Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2661 (2025) (mem.) (Barrett, J., concurring). There is reason to believe that this may be one such contract claim.

In *National Institutes of Health*, the Supreme Court stayed a district court's judgment vacating the "Government's termination of various research-related grants." 145 S. Ct. at 2259. One reason the Supreme Court granted a stay was doubt about "the District Court['s] . . . jurisdiction to adjudicate claims based on the . . . grants or to order relief designed to enforce any obligation to pay money pursuant to those grants." *Nat'l Insts. of Health*, 145 S. Ct. at 2259 (quotations omitted); *see also id.* at 2261 (Barrett, J., concurring) ("As today's order states, the District Court likely lacked jurisdiction to hear challenges to the grant terminations,

---

[2] In finding that the showing for likelihood of success on the merits should logically be lower for a TRO than for a preliminary injunction, the court is cognizant that the Seventh Circuit has been quite clear about what the standard on that factor is for a preliminary injunction. *See Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020). Neither the Supreme Court nor the Seventh Circuit in a precedential opinion has announced what showing is required for a TRO, which, for the reasons explained, is a meaningfully distinct type of injunction. That said, even if *Winter* and *Mays* supply the correct standard for TROs, and even if TROs and preliminary injunctions should otherwise be treated identically, this court's balancing of all the factors would not change for the reasons explained below.

4

which belong in the Court of Federal Claims."); *Dep't of Educ.*, 604 U.S. at 651. This case may well be similarly contractual in nature. In *National Institutes of Health* the underlying "grant terminations" included decisions not to renew grants—similar to the continued funding here. *See Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, No. 25-CV-10787, 2025 WL 1747128, at *1 n.1 (D. Mass. June 23, 2025). Indeed, in the CHA's own words, the funding here stems from "a HUD contract that goes back to the 1990s." [8] at 7. Moreover, the CHA requests relief that is contractual in nature: "The Court should enter a TRO immediately restraining Defendants from imposing" new conditions "on the CHA's continued receipt of federal funding" pursuant to its longstanding contract. [8] at 19.

And while *National Institutes of Health* was heard in an emergency posture, that does not mean this court can ignore it; rather, while "interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) (mem.). And in so questioning its jurisdiction, this court is not alone. *See Fairfax Cnty. Sch. Bd. v. McMahon*, No. 25-cv-1432, 2025 WL 2598622, at *3–5 (E.D. Va. Sept. 5, 2025). Granting a TRO with serious uncertainty about jurisdiction is improper.

But even setting aside the jurisdictional issue and assuming for the sake of argument, without deciding, that the CHA otherwise has a plausible case on the merits, the other relevant factors tilt strongly against the award of a TRO. In this case, the CHA waited until the eleventh hour to file a detailed complaint and briefing and inform the court that it needed a decision in less than five days (including the weekend). That strategy, for obvious reasons, left no meaningful time at all for HUD to respond. *See* 10/20/25 Hr'g Tr. at 3 (MR. JOHNSON: "Your Honor, as you know, this was filed late Thursday. We got it on Friday. We really haven't had a chance to look at it." (rough draft)).[3] By filing so late, this TRO is but a stone's throw away from an *ex parte* hearing. And naturally that imposes great prejudice on HUD's defense, not to mention the federal government's procedural due process rights.

And this late-stage filing was not practically necessary. HUD notified the CHA of its regulations months ago in July. [8-6] at 2, 9–10 (July 17, 2025 notice). By waiting so much longer than necessary to even begin this suit, the CHA has "undercut" its "claim of irreparable harm." *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (en banc). Indeed, nearly all the lawsuits the CHA cites where other courts have granted relief started months ago and were able to proceed in an ordinary

---

[3] *See also id.* at 3–4 (THE COURT: "Okay. Are you in a position to do any sort of argument on the issues in the TRO motion?" MR. JOHNSON: "Unfortunately not, Your Honor." THE COURT: "Okay." MR. JOHNSON: "I wouldn't want to waste the Court's time.").

5

fashion, with the safeguards which come along with proper briefing and hearings. Thus, the "emergency" nature of this suit is a product of CHA's own making.[4]

Further undercutting the CHA's claim of irreparable harm is the longstanding fact that "the loss of money is not typically considered irreparable harm." *Nat'l Insts. of Health*, 145 S. Ct. at 2658. To be sure, there are exceptions to that rule. *See id.* (quoting *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) (Scalia, Circuit Justice)). But the CHA has not claimed that any exceptions apply; nor is it required to forfeit this money in the interim while it challenges the certifications.

This court also recognizes that its sister branch will suffer "irreparable harm" if it is stymied from "enforc[ing] its duly enacted plans." *See Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). While at this stage there has not been fulsome briefing as to whether HUD's new rules are "duly enacted," that only means hampering them is a great risk. To enjoin HUD at the last minute, after it was denied any meaningful chance to defend its policies, would work a great inequity.

Furthermore, as explained above, the fast nature of TRO decisions imposes great costs on the ability of courts to decide effectively. To decide quickly, as the Supreme Court has explained, is sometimes the courts' job. *See A.A.R.P. v. Trump*, 605 U.S. 91, 94 (2025). But that emergencies happen does not change the reality that "[t]he risk of error increases when" courts "decide[] cases—as here—with barebones briefing, no argument, and scarce time for reflection." *Dep't of Educ.*, 604 U.S. at 653 (Kagan, J., dissenting). It is not in the public interest to reward the unnecessary creation of that risk.

Finally, and distinct from the *Winter* factors, courts sitting in equity have long abided by the principle that "unreasonable, prejudicial delay in commencing suit" "can always be brought to bear at the remedial stage[] in determining appropriate injunctive relief." *Petrella v. Metro-Goldwin-Mayer, Inc.*, 572 U.S. 663, 667–68 (2014). "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (quotation omitted). These principles further support the denial of a TRO.

* * *

---

[4] The CHA contends that the relevant date is September 17—the day the form containing the certifications went live. *See* [8-1] ¶ 19; 10/20/25 Hr'g Tr. at 5. The court finds that this claim is undermined by the record. HUD notified the CHA of these certifications months prior. [8-6] at 9–10. And litigants across the country managed to file their lawsuits far sooner. Furthermore, even if September 17 is the relevant date, the CHA still took several weeks to even initiate this suit, leaving HUD and the court little time to analyze the situation.

6

      Injunctive remedies are drastic and never awarded as a matter of right. *Cf. Winter*, 555 U.S. at 24. At this time, the court takes no definitive position on the CHA's ultimate likelihood of success on the merits, though it retains substantial doubts. The court further finds that *Winter*'s other factors, at least in this procedural posture, favor defendants. And while the CHA's dilatoriness does not, in the court's judgment, preclude its further seeking a preliminary injunction—and while the court will expeditiously conduct proceedings on a preliminary injunction, *see Office of Personnel Mgmt. v. Am. Fed'n of Gov't Emps., AFL-CIO*, 473 U.S. 1301, 1305 (1985)—the CHA's application for emergency relief [7] is denied.

Dated: October 20, 2025                          /s/ Martha M. Pacold